**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| RITA SKOLKIN, individually and on behalf of all others similarly situated,<br><br>                    Plaintiff,<br><br>v.<br><br>SHOREFRONT OPERATING LLC; SHOREFRONT REALTY LLC; SENTOSACARE, LLC; EXCELSIOR CARE GROUP LLC; SHAINDY BERKO; ROCHEL DAVID; LEAH FRIEDMAN; DEENA LANDA; ESTHER FARKOVITZ; AVI PHILIPSON; BERISH RUBINSTEIN; DAVID RUBINSTEIN; BRUSCHA SINGER; JOEL ZUPNICK; BENT PHILIPSON; BENJAMIN LANDA; and DOES 1-25,<br><br>                    Defendants. | **CLASS ACTION COMPLAINT**<br><br>Jury Trial Demanded |

Plaintiff Rita Skolkin, individually and on behalf of all others similarly situated (also referred to as "Patients," "Residents," or the "Class"), by and through her undersigned attorneys, Finkelstein, Blankinship, Frei-Pearson & Garber, LLP, as and for her class action complaint, alleges, based on personal knowledge as to her own actions and upon information and belief and investigation of counsel as to those of others, as follows:

**NATURE OF THE ACTION**

1.      Plaintiff brings this class action against Shorefront Operating LLC; Shorefront Realty LLC; SentosaCare, LLC; Excelsior Care Group LLC; Shaindy Berko; Rochel David; Leah Friedman; Deena Landa; Esther Farkovits; Avi Philipson; Berish Rubinstein; David Rubinstein; Bruscha Singer; Joel Zupnick; Bent Philipson; Benjamin Landa; and Does 1-25 (collectively, "Defendants") -- the owners and operators of Seagate Rehabilitation and Nursing Center, a nursing home located at 3015 West 29th Street, Brooklyn, New York (the "Facility") -- on behalf of herself and a class of similarly situated nursing home patients who were victimized

by unsafe and inadequate care in the Facility.  Defendants' unlawful conduct violates Section 2801-d of New York's Public Health Law ("PHL").[1]

2.  Defendants are entrusted to provide care to the elderly and infirm nursing home patients in their custody.  Unfortunately, Defendants have betrayed and continue to betray that trust.  For example, Defendants fail to sufficiently staff the Facility.  Throughout their operation of the Facility, Defendants have failed to staff a sufficient number of nurses and aides, thereby depriving the Facility's residents of the level of care required under New York and federal law.[2] Among many other shocking failures, this understaffing deprives residents of the nursing services the need to care for their basic activities of daily living, like using the bathroom, having incontinence diapers changed, being washed and cleaned, being moved in and out of beds and wheelchairs, and walking with needed assistance.  Seagate's insufficient nursing staff are also incapable of caring for residents' health care needs.

3.  Unsurprisingly, the Nursing Home Compare website operated by the federal Centers for Medicare & Medicaid Services ("CMS") shows that the Facility currently receives a

---

[1] PHL § 2801-d provides a cause of action by residents against nursing homes that deprive them of "any right or benefit created or established for the well-being of the patient by the terms of any contract, by any state statute, code, rule or regulation or by any applicable federal statute, code, rule or regulation."  *See* PHL § 2801-d(1).

[2] *See* 10 N.Y.C.R.R. § 415.13 (mandating that a nursing facility "shall provide sufficient nursing staff to provide nursing and related services to attain or maintain the highest practicable physical, mental, and psychosocial well-being of each resident"); 42 U.S.C. § 1396r(b)(4)(C)(i)(I) (mandating that a nursing facility "must provide 24-hour licensed nursing services which are sufficient to meet the nursing needs of its residents"); 42 U.S.C. § 1395i-3(b)(4)(A)(i) (mandating that a nursing facility must provide "nursing services and specialized rehabilitative services to attain or maintain the highest practicable physical, mental, and psychosocial well-being of each resident").

rating of one star ("much below average") out of a five star scale in staffing, further evidencing the lack of adequate care and staffing at the Facility.[3]

4.      As the Facility has approximately 360 beds and is operating at a high occupancy rate (above 95%),[4] there are many other residents currently languishing in an unsafe and inadequate nursing home.

5.      Accordingly, Plaintiff, individually and on behalf of the Class, asserts claims against Defendants pursuant to PHL § 2801-d and seeks monetary damages in an amount to be determined at trial, statutory damages in accordance with PHL § 2801-d(2), and injunctive relief prohibiting further wrongful conduct, as well as any other available relief at law or in equity.

## PARTIES

**Plaintiff**

6.      Plaintiff Rita Skolkin, who is a current resident of the Facility and has been since approximately 2013, sues on her own behalf and on behalf of all other Seagate residents.

7.      Plaintiff Rita Skolkin is a citizen and resident of Brooklyn, New York.

**Defendants**

8.      Defendant Shorefront Operating LLC ("Shorefront Operating") is a New York limited liability company with its principal place of business in Kings County, New York.  At all relevant times, Shorefront Operating has been the licensed operator of the Facility.  Shorefront

---

[3] *See* Nursing Home Compare Profile for the Facility (available at https://www.medicare.gov/NursingHomeCompare/profile.html#profTab=-1&ID=335513) (accessed October 7, 2022) (copy annexed as Exhibit 1).

[4] *See* New York State Department of Health profile for the Facility (available at https://profiles.health.ny.gov/nursing_home/view/150691) (accessed October 7, 2022) (copy annexed as Exhibit 2).

Operating provides an address for service by the New York State Department of State of 20 Franklin Place, Woodmere, New York 11598.

9.      Defendant Shorefront Realty LLC ("Shorefront Realty") is a New York limited liability company with its principal place of business in Kings County, New York.  Shorefront Realty is a controlling person of the Facility pursuant to PHL § 2808-a.[5]  Shorefront Realty owns the property occupied by the Facility and receives artificially inflated rent payments from Shorefront Operating for the use of the property.  Moreover, there is a significant overlap in the ownership of Shorefront Realty and Shorefront Operating.  Indeed, Shorefront Realty provides an address for service by the New York State Department of State of 20 Franklin Place, Woodmere, New York 11598, the same address as Shorefront Operating.  At all relevant times, Shorefront Realty has had at least an indirect and/or beneficial ownership interest in the operation of the Facility as well as the ability, acting either alone or in concert with others with ownership interests in the operation of the Facility, to direct or cause the direction of the management or policies of the Facility.

10.     Defendant SentosaCare, LLC ("SentosaCare") was a New York limited liability company with its principal place of business in Nassau County, New York.  SentosaCare was a controlling person of the Facility pursuant to PHL § 2808-a.  SentosaCare provided administrative and operational services to the Facility.  Moreover, there is a significant overlap in the ownership of SentosaCare, Shorefront Realty, and Shorefront Operating.  Indeed, the proposed operator of the Facility was initially "Shorefront Operating LLC c/o SentosaCare,

---

[5] PHL § 2808-a provides that "a 'controlling person' of a residential health care facility shall be deemed to mean any person who by reason of a direct or indirect ownership interest (whether of record or beneficial) has the ability, acting either alone or in concert with others with ownership interests, to direct or cause the direction of the management or policies of said facility."

LLC," and SentosaCare even provides an address for service by the New York State Department of State of 20 Franklin Place, Woodmere, New York 11598, the same address as Shorefront Operating and Shorefront Realty.  SentosaCare has had at least an indirect and/or beneficial ownership interest in the operation of the Facility as well as the ability, acting either alone or in concert with others with ownership interests in the operation of the Facility, to direct or cause the direction of the management or policies of the Facility.

11.     Defendant Excelsior Care Group LLC ("Excelsior") is a New York limited liability company with its principal place of business in Kings County, New York.  Excelsior is a controlling person of the Facility pursuant to PHL § 2808-a.  In 2019, following a corporate restructuring, Excelsior took over SentosaCare's role and all of its responsibilities at the Facility, including having and exercising authority with respect to the operation of the Facility and its staffing.  Subsequent to its takeover, Excelsior has had at least an indirect and/or beneficial ownership interest in the operation of the Facility, as well as the ability, acting either alone or in concert with others with ownership interests in the operation of the Facility, to direct or cause the direction of the management or policies of the Facility.

12.     Defendants Shaindy Berko, Rochel David, Leah Friedman, Deena Landa, Avi Philipson, Berish Rubinstein, David Rubinstein, Bruscha Singer, Joel Zupnick, Bent Philipson, and Benjamin Landa are citizens and residents of New York State.  Defendant Esther Farkovits (a/k/a Esther Farkovitz a/k/a Esther Landa) is a citizen and resident of the nation of Israel. Defendants Shaindy Berko, Rochel David, Leah Friedman, Deena Landa, Esther Farkovits, Avi Philipson, Berish Rubinstein, David Rubinstein, Bruscha Singer, Joel Zupnick, Bent Philipson, and Benjamin Landa are all controlling persons of the Facility pursuant to PHL § 2808-a.

13.     Defendants Shaindy Berko, Rochel David, Leah Friedman, Deena Landa, Esther Farkovits, Avi Philipson, Berish Rubinstein, David Rubinstein, Bruscha Singer, Joel Zupnick, and Bent Philipson each hold membership interests in Shorefront Operating LLC and have the ability, acting either alone or in concert with others with ownership interests in the operation of the Facility, to direct or cause the direction of the management or policies of the Facility.

14.     Defendants Bent Philipson and Benjamin Landa have at least an indirect and/or beneficial ownership interest in the operation of the Facility as well as the ability, acting either alone or in concert with others with ownership interests in the operation of the Facility, to direct or cause the direction of the management or policies of the Facility.

15.     In addition to the defendants identified with particularity, Plaintiff alleges all claims against Does 1-25, with addresses and names unknown, who are other persons that have owned, operated, or controlled the Facility during the relevant period.

## JURISDICTION AND VENUE

16.     This Court has original subject-matter jurisdiction over this proposed class action pursuant to 28 U.S.C. § 1332(d), which, under the provisions of the Class Action Fairness Act ("CAFA"), explicitly provides for the original jurisdiction of the federal courts in any class action in which the proposed plaintiff class is comprised of at least 100 members, any member of a class of plaintiffs is a citizen of a State and any defendant is a citizen or subject of a foreign state, and the matter in controversy exceeds the sum of $5,000,000.00, exclusive of interest and costs.  The total claims of individual members of the proposed Class (as defined herein) are well in excess of $5,000,000.00 in the aggregate, exclusive of interest and costs.

17.     Further, as Defendants argued in their June 17, 2019 removal petition in a functionally identical case, *Chow v. Shorefront Operating LLC*, "[t]his action is a civil action removable to this Court pursuant to 28 U.S.C. §§ 1331, 1367, and 1441(a).  This Court has

original jurisdiction over this action because it arises under the laws of the United States. Plaintiff[s'] claims depend on the definition, interpretation and application of the federal Nursing Home Reform Act.  The Complaint also contains repeated allegations concerning the federal Centers for Medicare & Medicaid Services ("CMS"), part of the federal Department of Health and Human Services, regarding a CMS reporting site and associated ratings and the interpretations of those ratings . . . To the extent some of Plaintiff[s'] claims do not depend on the definition, interpretation and application of federal law, this Court has supplemental jurisdiction over these other claims because they form part of the same case or controversy under Article III of the United States Constitution. 28 U.S.C. § 1367." *Chow v. Shorefront Operating LLC*, Ind. No. 523769/2018, NYSCEF No. 35 (N.Y. Sup. Ct. Kings Cty.).  This case deals with the same subject matter and defendants as *Chow v. Shorefront Operating LLC*.

18.     This Court has personal jurisdiction over the parties because Plaintiff and several of the Defendants reside in the State of New York.  Additionally, Defendants have conducted and do conduct substantial business in this State, including through operation of the Facility; have had systematic and continuous contacts with this State, including through operation of the Facility; and have agents and representatives that can be found in this State, including through operation of the Facility.

19.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because Defendants' contacts are sufficient to subject them to personal jurisdiction in this District and a substantial part of the events and omissions giving rise to the claims occurred in this District.  Defendants operated the Facility in this District.  Furthermore, Plaintiff and several of the Defendants reside within this District.

## FACTUAL BACKGROUND

I.     **The Nursing Home Crisis Leads To Legislation Granting Patients
       A Right To Bring Class Actions Against Operators For Improper
       Care And To Federal Databases Tracking Nursing Home Ratings.**

20.    In an effort to protect the vulnerable nursing home population, ensure that their rights are enforced, and provide them with a form of legal recourse which would not otherwise be economically feasible, the New York State Legislature enacted PHL §§ 2801-d and 2803-c.

21.    Predating the enactment of PHL §§ 2801-d and 2803-c, "the public's confidence in the State's ability to protect its most defenseless citizens, the aged and infirm, had been destroyed by a series of dramatic disclosures highlighting the abuses of nursing home care in their State." *See* Governor's Memoranda, Nursing Home Operations, McKinney's 1975 Session Laws of New York, p.1764.  In Governor Carey's letter to the Legislature accompanying the bills for PHL §§ 2801-d and 2803-c, he stated that these bills were "designed to deal directly with the most serious immediate problems which have been uncovered with respect to the nursing home industry."  The Sponsor's Memorandum relating to PHL § 2803-c and the transcripts of the Senate debates indicate that the purpose of the statute was to establish certain minimum standards for the care of nursing home patients.  *See* Governor's Bill Jacket for Chapter 648 of the Laws of 1975; Senate Debate Transcripts, 1975, Chapter 648 Transcripts, pp.4521, 4525.  The term "residential health care facility" was intentionally used by the Legislature in an effort to curb abuses in the nursing home industry.

22.    The Commission's Summary Report specifically indicated that PHL § 2801-d creates a cause of action for a patient of a facility which deprived the patient "of rights or benefits created for his well-being by federal or state law or pursuant to contract" which resulted in injury to the patient.  The Commission stated that this statute "introduce[s] a degree of equality between nursing homes and their otherwise vulnerable and helpless patients and,

through private litigation brought by patients either in individual or class action lawsuit, provides a supplemental mechanism for the enforcement of existing standards of care."

23.     The Legislative Memorandum "Nursing Home–Health Care Facilities–Actions by Patients" relating to PHL § 2801-d observes that nursing home patients "are largely helpless and isolated," that many are "without occasional visitors," and that "[m]ost cannot afford attorneys," and therefore the bill provides nursing home patients "with increased powers to enforce their rights to adequate treatment and care by providing them with a private right of action to sue for damages and other relief and enabling them to bring such suits as class actions." *See* McKinney's Session Laws of New York, 1975, pp.1685-86.  That memorandum states that the proposed PHL § 2801-d "creates incentives which would encourage private non-governmental parties (*i.e.*, plaintiffs' attorneys) to help protect the rights of nursing home patients." *Id.*

24.     This statutory cause of action was created as an additional remedy, separate and distinct from other available traditional tort remedies.

25.     In addition, in December of 2008, in the wake of an emphasized focus on the adequacy of care provided by skilled nursing home facilities, the Centers for Medicare & Medicaid Services ("CMS") enhanced its Nursing Home Compare public reporting site to include a set of ratings for each nursing home that participates in Medicare or Medicaid.  The primary goal of this rating system is to provide residents and their families with an easy way to assess nursing home quality in order to make meaningful distinctions between high and low performing nursing homes.  The rating system features include an overall five-star rating based on facility performance in staffing, which is a measure based on the nursing home's aggregate staffing demand (based ultimately on the residents' Minimum Data Set ("MDS") -- a set of metrics used to determine for each resident the amount of staffing needed) and staffing supply

9

(based on payroll records for Registered Nurse ("RN"), Licensed Practitioner Nurse ("LPN"), and nurse aide hours per resident per day).

26.     This class action seeks to address the injustices that caused the Legislature to enact PHL § 2801-d.  As alleged in more detail below, Defendants have violated and continue to violate their statutory obligations by failing to provide, among other things, adequate nursing services, supervision, treatment, hygiene, and medical attention to the Class.

## II.   Bent Philipson And Ben Landa, Through Sentosacare, Were The Architects And The Purchase And Profitization Of The Seagate Facility And Real Property, Acquired A Direct And Indirect Interest In The Home, And Exercise Operational Control Of The Facility.

27.     Previously known as the Shorefront Jewish Geriatric Center and operated by the not-for-profit corporation Shorefront Jewish Geriatric Center, Inc., the Facility was sold in December 2014 to two entities -- owned almost entirely by the same parties -- in a deal worth $50,000,000.00.  Defendant Shorefront Realty purchased the Facility's real estate for $32,000,000.00, and defendant Shorefront Operating purchased the Facility's operations for $18,000,000.00.  Subsequent to the sale, Shorefront Operating made lease payments to Shorefront Realty for use of the Facility.  Mortgage financing of approximately $45,000,000.00 was provided by Greystone Funding Corporation.  As part of the sale, the name under which the Facility operates was changed to Seagate Rehabilitation and Nursing Center.  Also as part of the sale, Shorefront Operating contracted with SentosaCare to provide various administrative and resident care services to the Facility.  Defendants informed the New York Department of Health that they expected an annual net income (exclusive of profits taken by the owners of Shorefront Realty) of approximately $1,000,000.00.

28.     Ben Landa initiated and facilitated the sale with Sam Schlesinger.  The two identified the Shorefront Jewish Geriatic Center as a good acquisition target.  Mr. Schlesinger

arranged a meeting for the CEO of Shorefront Jewish Geriatic, himself, and Ben Landa.  The three met and agreed on the purchase price of $50,000,000.

29.     Mr. Landa planned the purchase of the home with a combination of financing and cash equity.  Mr. Landa and Mr. Schlesinger gathered investors, all of whom were either family, friends, or existing business associates.  Shaindy Berko, for example, is Mr. Schlesinger's daughter.  Mr. Landa also paid for the capital contribution of his own daughters, Deena Hersh Landa and Esther Farkovitz, so that they could both be ten percent owners of Shorefront Operating.  Mr. Landa also approached Bent Philipson, a long-time business partner, to join in the purchase and operation of the Facility.  Mr. Bent Philipson then involved his son, Avi Philipson.  Mr. Landa dealt with Mr. David Zahler, who facilitated gifts of ownership to his own daughters, Leah Friedman and Rochel David.  Mr. Landa approached David Rubinstein and Mr. Berkowitz, who looped in Joel Zupnick.  Mr. Landa approached Nuchem Singer, whose wife, Brucha Singer, became an investor.  These investors gathered approximately $5,000,000 and financed the remaining amount through a mortgage with Greystone.

30.     These investors, now the Defendants, elected to split up the Facility and the land into separate entities, valuing amongst themselves the real estate at $18,000,000 and the Facility business at $30,000,000.

31.     Shorefront Operating has three official managing members, one of whom is Avi Phillipson, son of Bent Phillipson, and another is Esther Farkovits, daughter of Mr. Landa.

32.     As a result of a lease approved by Ben Landa and his long-time business partner's son Avi Phillipson, the Defendants funneled substantial money out of the Facility into the real estate business.  Indeed, the profit on rent payments, over and above the amount needed to pay the principle and interest on the Greystone mortgage, is more than $2.5 million, an amount that is

more than double the profit Defendants chose to disclose to the New York Department of Health and that increases every year.

33.     The Defendants outsourced much of the management of the Facility to SentosaCare, which Benjamin Landa led as CEO and Bent Philipson led as COO.  To that end, Mr. Landa and Mr. Phillipson hired Eli Grinspan as a regional administrator with responsibilities that included the management and operation of the Facility.  During his time at SentosaCare, Mr. Grinspan reported to Mr. Landa and Mr. Philipson, and in turn Mr. Grinspan hired and directed the head administrators at the Facility.  Meanwhile, Mr. Landa and Mr. Philipson provide "management consulting" services to the Facility at the price of $15,000 per month each as a "management fee."  In a deposition in a related case against Seagate, Mr. Landa testified that Shorefront Operating pays Mr. Landa and Mr. Philipson approximately $15,000 per month for their management consulting services.  The Facility pays these "management fees" to Mr. Landa and Mr. Philipson in connection with various operations at the Facility, including, but not limited to, labor relation issues, hiring of Facility administrative staff (including Manny Kaufman, the head administrator at the Facility), recommendations regarding how to affect CMS star ratings, and reimbursement issues.

34.      Mr. Bent Philipson is a direct 1% owner of the Facility.

### III.   The Facility Is Unsafe And The Conditions To Which Its Patients Are Subjected Violate Numerous Statutes.

35.     Conditions at the Facility have been and continue to be unsafe and violative of applicable laws, rules, and regulations, and the care provided to Rita Skolkin and the Class has been and continues to be inadequate.

36.     Defendants failed and continue to fail to care for the Facility's residents in a manner that maintains or enhances each resident's dignity and respect in full recognition of their

individuality and in contravention of applicable federal and New York State laws, rules, and regulations.

37.     Among other failures, Defendants failed and continue to fail to provide sufficient nursing staff to provide the nursing and related services necessary to attain and maintain the highest practicable physical and psycho-social well-being of the residents.  A resident's right to sufficient staffing is one of the most important rights protected by New York and federal statutes.[6]

38.     As early as October 2015, local news media reported that staffing levels among nursing homes administered by SentosaCare were egregiously low.[7]  At that time and until Excelsior assumed SentosaCare's responsibilities, the Facility was administered by SentosaCare.

39.     Currently, the Facility receives a rating of one star ("much below average") out of a five star scale in staffing from the Nursing Home Compare website operated by CMS.[8]  CMS's star ratings for staffing reflect the relationship of a facility's reported staffing levels to its expected staffing levels (determined by looking at the number of residents and their reported medical conditions).  A one-star or two-star rating indicates that the Facility has actual staffing levels below the expected staffing levels, based on the needs of the residents.  Defendants here have failed to adequately staff the Facility for years; during every quarter beginning in 2013 to the present, the Facility has received either one-star or two-star ratings for overall staffing and RN staffing.

---

[6] *See* 10 N.Y.C.R.R. § 415.13; 42 U.S.C. § 1396r(b)(4)(C)(i)(I); 42 U.S.C. § 1395i-3(b)(4)(A)(i).

[7] *See* https://www.propublica.org/article/new-york-for-profit-nursing-home-group-flourishes-despite-patient-harm (accessed October 10, 2022) (copy annexed as Exhibit 3).

[8] *See* Exhibit 1.

40.     The New York Attorney General's Office has recently taken action against another nursing home in defendant Benjamin Landa's possession for its failure to provide sufficient care to its residents.[9]

41.     Defendants' failure to properly staff the Facility is particularly egregious because understaffing is one of the primary causes of inadequate care and often unsafe conditions in nursing facilities.  Numerous studies have shown a direct correlation between inadequate staffing and serious care problems including, but not limited to, a greater likelihood of falls, pressure sores, significant weight loss, incontinence, other health problems, and premature death. Although the dangers caused by understaffing are common knowledge in the nursing home industry, Defendants nonetheless chose not to provide adequate staffing levels.

42.     In addition, Defendants failed and continue to fail to provide each patient with the appropriate food.  For example, the Facility staff served meat sliced too large to Ms. Skolkin, putting her at risk of choking.

43.     Defendants have subjected the Facility residents to indignities and other harms that cause physical and emotional injury and distress that directly resulted and continue to result from inadequate nurse staffing levels at the Facility, including, but not limited to, the following: infrequent and inadequate turning and repositioning; no response or long response times to call lights; failure to provide adequate showers; lack of assistance with grooming and bathing; inadequate attention to toileting needs, resulting in Ms. Skolkin and the Class remaining in their own urine and/or fecal matter for extended periods of time; lack of assistance with eating; failure to provide fluids as needed; lack of assistance with dressing; and being confined to their beds

---

[9] See *People Of New York By Letitia James v. Comprehensive At Orleans, LLC. et al.*, Memorandum of Law in Support of the Verified Petition.

without removal for long periods.  Indeed, Plaintiff has found no nurses or doctors present on the floor for hours at a time or indeed for an entire evening.  Such neglect causes significant emotional and physical injury.

44.     For example, Ms. Skolkin has repeatedly fallen and suffered extensive contusions and bruising in the Facility as a result of the Facility's understaffing (because there are not enough staff to help her move and walk when she needs to).  Some of these falls caused injury to her ankles.  Plaintiff Skolkin tore her ligaments in some of these falls.  She required stitches at the hospital as a result of at least two of these falls.  Consequent to the falls, Ms. Skolkin cannot shower herself and requires assistance from Facility staff.  But there is not enough staff to assist Plaintiff Skolkin.

45.     The Facility staff has failed to help Ms. Skolkin to the restroom in a timely manner, despite her ringing the call bell, forcing Ms. Skolkin to sit in her own waste, which causes physical and emotional injury.

46.     The Facility staff rarely administers Plaintiff Skolkin's medication on time.  This is detrimental to her health.

47.     The Facility staff sometimes neglect to provide Plaintiff her medication at all. This neglect forces Ms. Solkin, at 85-years-old, to track down a staff member and beg for her medication.

48.     The Facility staff fail to maintain adequate supply of Plaintiff Skolkin's medication.  Oftentimes, the Facility staff cannot provide Plaintiff Skolkin her medication because the Facility failed to order the medication from its medical supplier.

49.     The Facility staff sometimes fail to administer the correct dosage of medication to Plaintiff Skolkin.

50.     When Plaintiff Skolkin asks the Facility staff for assistance, sometimes the staff tell her that they are too busy to help.

51.     Facility staff serve meals late to Plaintiff Skolkin.  The food is cold and is of low nutritional value.  Sometimes the food causes Plaintiff Skolkin to vomit or regurgitate.  Plaintiff Skolkin has complained to the Facility multiple times but the food does not improve.

52.     As a result of Defendants' inadequate care, Plaintiff has sustained injuries and endured conscious pain and suffering.

53.     As a result of Defendants' inadequate care, the other members of the Class have sustained physical and emotional injuries and endured conscious pain and suffering.

54.     Defendants' inadequate care also injured Plaintiff and the other members of the Class by placing them at an increased risk of harm.

55.     And Defendants' failure to satisfy their obligations pursuant to federal and New York law -- particularly the obligation to provide sufficient staffing -- financially injured Ms. Skolkin and the other members of the Class by depriving them of the benefit of the services for which Defendants were paid -- namely, a nursing home with, at the least, staffing sufficient to satisfy the requirements of New York and federal law.  Indeed, Defendants were reimbursed by Medicare, or paid by private insurance, to provide a level of care that they failed to actually provide for residents, and they did so for the callous, willful reason that they prioritized profits over resident wellbeing.

## CLASS ACTION ALLEGATIONS

56.     Plaintiff brings this action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of herself and all others similarly situated.  The Class is defined as:

All persons who reside, or resided, at the Facility from December 1, 2014, to the present.[10]

57.     Plaintiff reserves the right to amend the above definitions, or to propose other or additional classes, in subsequent pleadings and/or motions for class certification.

58.     Plaintiff is a member of the Class.

59.     Excluded from the Class are: (i) Defendants; any entity in which Defendants have a controlling interest; the officers, directors, and employees of Defendants; and the legal representatives, heirs, successors, and assigns of Defendants; (ii) any judge assigned to hear this case (or any spouse or family member of any assigned judge); (iii) any juror selected to hear this case; (iv) claims for personal injury and wrongful death; and (v) any and all legal representatives of the parties and their employees.

60.     This action seeks to enjoin Defendants from understaffing the Facility, failing to disclose understaffing at the Facility, and making misleading promises about staffing at the Facility.  In addition, this action seeks recovery -- including statutory minimum damages -- from the Defendants for injuries resulting from Defendants' failure to meet their contractual, statutory, and regulatory obligations.

61.     Plaintiff and the Class satisfy the requirements for class certification for the following reasons:

62.     **Numerosity of the Class.**  At this time, Plaintiff does not know the exact number of members of the Class, but the number is estimated to be in the hundreds, if not thousands. Therefore, the members of the Class are so numerous that their individual joinder is

---

[10] There is an overlapping class action currently filed against Defendants.  *See Chow v. Seagate*. Should that case be certified as a class action, Plaintiff will limit the class in this case to ensure the two do not overlap.

impracticable.  The precise number of persons in the Class and their identities and addresses may

be ascertained from Defendants' records.

63.    **Common Questions of Fact and Law.**  There are questions of law or fact

common to the Class that predominate over any questions affecting only individual members,

including:

> a.  Whether Defendants violated or violate New York laws, including, but not limited to, PHL § 2801-d, by depriving any patient of the Facility of any right or benefit created or established for the well-being of the patient by the terms of any contract, by any state statute, code, rule, or regulation, or by any applicable federal statute, code, rule, or regulation during the Class Period;
>
> b.  Whether Defendants violated or violate New York laws, including, but not limited to, PHL § 2803-c, by failing to provide any patient of the Facility with adequate and appropriate medical care, failing to provide courteous, fair and respectful care and treatment, and failing to ensure every patient was free from mental and physical abuse during the Class Period;
>
> c.  Whether Defendants failed or fail to employ an adequate number of qualified personnel to carry out all of the functions of the Facility in violation of PHL §§ 2801-d and 2803-c;
>
> d.  Whether Defendants' decision to understaff the Facility violated or violates any right(s) of residents as set forth in PHL §§ 2801-d and 2803-c;
>
> e.  Whether Defendants' decision to understaff the Facility and failure to provide adequate and appropriate medical care violated or violates any right(s) of residents as set forth in the Patients' Bill of Rights pursuant to PHL § 2803-c;
>
> f.  Whether Defendants' conduct violated or violates sections 31.19(a) and 16.19(a) of the New York Mental Hygiene Law;
>
> g.  Whether Defendants' conduct violated or violates section 415 of the New York Code Rules and Regulations, including but not limited to subsections 415.3, 415.5, 415.12, 415.13, 415.14, 415.15, and 415.26;
>
> h.  Whether Defendants' conduct violated or violates the federal Nursing Home Reform Act, codified at 42 U.S.C. §§ 1395i-3(a)-(h) & 1396r(a)-(h) and at 42 C.F.R. §§ 483.15, 483.20, 483.25, 483.30, 483.40, 483.60, & 483.75; and
>
> i.  Whether Defendants' failure to provide the Class with the benefits they were owed was intentional or willful.

64.   **Typicality.**  The claims of Plaintiff's are typical of the claims of the proposed Class because Plaintiff's claims are based upon the same legal theories and same violations of New York State and federal law.  Plaintiff's grievances, like the proposed Class members' grievances, all arise out of the same business practices and course of conduct by Defendants. Further, Plaintiff's damages arise out of a pattern of uniform and repetitive business practices conducted by Defendants.

65.   **Adequacy.**  Plaintiff will fairly and adequately represent the Class on whose behalf this action is prosecuted.  Her interests do not conflict with the interests of the Class.

66.   Plaintiff and her chosen attorneys, Finkelstein, Blankinship, Frei-Pearson & Garber, LLP ("FBFG"), are familiar with the subject matter of the lawsuit and have full knowledge of the allegations contained in this Complaint so as to be able to assist in its prosecution.  Indeed, FBFG has been appointed as lead counsel in several complex class actions across the country, including certified class actions involving PHL § 2801-d and has secured numerous favorable judgments in favor of its clients.  FBFG's attorneys are competent in the relevant areas of the law and have sufficient experience to vigorously represent the Class members.  Finally, FBFG possesses the financial resources necessary to ensure that the litigation will not be hampered by a lack of financial capacity and is willing to absorb the costs of the litigation.

67.   **Superiority.**  A class action is superior to any other available methods for adjudicating this controversy.  The proposed class action is the surest way to fairly and expeditiously compensate so large a number of injured persons, to keep the courts from becoming paralyzed by hundreds -- if not thousands -- of repetitive cases, and to reduce transaction costs so that the injured Class members can obtain the most compensation possible.

68.     Class treatment presents a superior mechanism for fairly resolving similar issues and claims without repetitious and wasteful litigation for many reasons, including the following:

a.  Absent a class action, Class members will suffer continuing, ever-increasing damages; violations of Class members' rights will continue without remedy; and the Facility will continue to remain understaffed, resulting in the mistreatment and improper care of Patients at the Facility.

b.  It would be a substantial hardship for most individual members of the Class if they were forced to prosecute individual actions. Many members of the Class are not in the position to incur the expense and hardship of retaining their own counsel to prosecute individual actions, which in any event might cause inconsistent results.

c.  When the liability of Defendants has been adjudicated, the Court will be able to determine the claims of all members of the Class. This will promote global relief and judicial efficiency in that the liability of Defendants to all Class members, in terms of money damages due and in terms of equitable relief, can be determined in this single proceeding rather than in multiple, individual proceedings where there will be a risk of inconsistent and varying results.

d.  A class action will permit an orderly and expeditious administration of the Class claims, foster economies of time, effort, and expense, and ensure uniformity of decisions. If Class members are forced to bring individual suits, the transactional costs, including those incurred by Defendants, will increase dramatically, and courts will be clogged with a multiplicity of lawsuits concerning the very same subject matter, with the identical fact patterns and the same legal issues. A class action will promote a global resolution, and will promote uniformity of relief as to the Class members and as to Defendants.

e.  This lawsuit presents no difficulties that would impede its management by the Court as a class action. The class certification issues can be easily determined because the Class includes only the residents of the Facility, the legal and factual issues are narrow and easily defined, and the Class membership is limited. The Class does not contain so many persons that it would make the Class notice procedures unworkable or overly expensive. The identity of the Class members can be identified from Defendants' records, such that direct notice to the Class members would be appropriate.

69.     In addition, the prerequisites to maintaining a class action for injunctive or equitable relief are met as Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive or equitable relief with respect to the Class.

70.     The prosecution of separate actions by members of the Class would create a risk of establishing inconsistent rulings and/or incompatible standards of conduct for Defendants. For example, one court might enjoin Defendants from understaffing, whereas another might not. Additionally, individual actions could be dispositive of the interests of members of the Class who are not parties to such actions.

## CAUSE OF ACTION

## PUBLIC HEALTH LAW § 2801-d

71.     Plaintiff incorporates by reference and realleges herein all paragraphs alleged above.

72.     At all relevant times, Shorefront Operating conducted business as the licensed operator of the Facility, located at 3015 West 29th Street, Brooklyn, NY 11224.

73.     At all relevant times, Shorefront Operating had possession and control of the Facility.

74.     At all relevant times, Shorefront Realty, SentosaCare, Excelsior, Shaindy Berko, Rochel David, Leah Friedman, Deena Landa, Esther Farkovits, Avi Philipson, Berish Rubinstein, David Rubinstein, Bruscha Singer, Joel Zupnick, Bent Philipson, Benjamin Landa, and Does 1-25 have each had an ownership interest in the operations of the Facility and the ability, acting either alone or in concert with others with ownership interests, to direct or cause the direction of the management or policies of the Facility, and are thus controlling persons of the Facility pursuant to PHL § 2808-a.

75.     At all relevant times, the Facility has operated as a residential health care facility as defined in PHL § 2801(3).  The Facility provides nursing care to sick, invalid, infirm, disabled or convalescent persons in addition to lodging and board or health-related service, and is thus a nursing home as defined in PHL § 2801(2).

76.     Accordingly, Defendants are subject to the provisions of PHL §§ 2801-d and 2803-c, as well as the rules and regulations set forth in sections 31.19(a) and 16.19(a) of the New York Mental Hygiene Law, section 415 of the New York Code Rules and Regulations, and the federal Nursing Home Reform Act.  These rules and regulations impose various obligations on Defendants, including, among others, a duty to adequately staff the Facility.

77.     Plaintiff and the Class entered the Facility for care, treatment, supervision, management, and/or rehabilitation.

78.     Plaintiff and the Class were under the exclusive care, custody, control, treatment, rehabilitation, supervision, and management of Defendants.

79.     During the period of Plaintiff's and the Class's residency in the Facility, Defendants, through their officers, employees, agents, and staff, violated PHL § 2801-d by depriving Plaintiff and the Class of rights or benefits created or established for their well-being by the terms of a contract(s) and/or by the terms of state and federal statutes, rules, and regulations.

80.     During Plaintiff's and the Class's residency, they sustained personal injuries and suffered mental anguish as a result of Defendants' failure to meet their contractual, statutory, and regulatory obligations, particularly the obligation to adequately staff the Facility.

81.     During Plaintiff's and the Class's residency at the Facility, the Facility subjected the residents to injurious indignities and emotional harms and other harms that directly resulted and result from inadequate staffing levels at the Facility, including, but not limited to, the following: infrequent and inadequate turning and repositioning; no response or long response times to a call light; failure to provide adequate showers; lack of assistance with grooming and bathing; inadequate attention to toileting needs requiring residents to remain in their own urine

and fecal matter for extended periods of time; lack of assistance with eating; failure to provide fluids as needed; lack of assistance with dressing; and being confined to bed without removal for long periods.

82.     Plaintiff and her family complained to the Facility's staff regarding the neglectful, improper, and/or inadequate care and treatment of Plaintiff and the other members of the Class.

83.     As a result of the foregoing acts and/or omissions, Defendants deprived Plaintiff and the Class of their rights in violation of PHL § 2801-d.

84.     Defendants' deprivation of Plaintiff's and the Class's rights in violation of PHL § 2801-d substantially contributed to, created, and/or caused Plaintiff's and the Class's injuries. These injuries include, but are not limited to, the following: being subjected to an increase risk of harm; being forced to undergo unnecessary medical treatment; incurring medical expense; suffering disfigurement, disability, mental anguish, and physical and emotional pain and suffering; loss of enjoyment of life and dignity; and suffering a financial loss of the benefit of the bargain for which they contracted with Defendants -- namely, residency at a nursing home with, at the least, staffing sufficient to satisfy the requirements of New York and federal law.

85.     Defendants' responsibilities and obligations to Plaintiff and the Class are non-delegable, and thus Defendants have direct and/or vicarious liability for violations, deprivations, and infringements of such responsibilities and obligations by any person or entity under Defendants' control, direct or indirect, including their employees, agents, consultants, and independent contractors, whether in-house or outside entities, individuals, agencies, or pools, or caused by Defendants' policies, whether written or unwritten, or their common practices.

86.     All acts and omissions committed by employees and agents of Defendants were pervasive, omnipresent events that occurred and continued throughout Plaintiff's residency and

the other members of the Class's residency at the Facility, and were such that supervisors, administrators, and managing agents of Defendants knew, or should have been aware, of them.

87.     Pursuant to PHL § 2801-d(2), Plaintiff and the Class seek statutory damages in the amount of twenty-five percent of the daily per-patient rate of payment established for the Facility under PHL § 2807, or, in the event the Facility does not have an established rate, the average daily total charges per patient for the Facility, for each patient for each day that such injury existed.

88.     Plaintiff seeks injunctive relief.  Plaintiff requests the Court issue an order directing the Facility to implement sufficient staffing pursuant to its obligations under New York and federal law.

89.     In addition to damages suffered by Plaintiff and the Class as the result of the deprivation of their rights as nursing home residents, justice requires that Plaintiff and the Class recover attorney's fees pursuant to PHL § 2801-d(6), punitive damages pursuant to PHL § 2801-d(2), and costs.

90.     Moreover, pursuant to PHL § 2808-a(1), Shorefront Realty, SentosaCare, Excelsior, Shaindy Berko, Rochel David, Leah Friedman, Deena Landa, Esther Farkovits, Avi Philipson, Berish Rubinstein, David Rubinstein, Bruscha Singer, Joel Zupnick, Bent Philipson, Benjamin Landa, and Does 1-25, as controlling persons of the Facility, are liable, jointly and severally, with and to the same extent as Shorefront Operating, to the Plaintiff and the Class.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment on behalf of herself and the Class as follows:

a.  Certifying that the action may be maintained as a class action;

b.  Requiring that Defendants pay for notifying the members of the Class of the pendency of this suit;

c.  Awarding Plaintiff and the Class injunctive relief prohibiting Defendants' violations of PHL §§ 2801-d and 2801-c in the future;

d.  On the First Cause of Action for violation of PHL § 2801-d, awarding Plaintiff and the Class monetary damages in an amount to be determined at trial and punitive damages;

e.  For restitution and any other monetary relief permitted by law;

f.  For attorney's fees and costs; and

g.  For such other and further relief as the Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Pursuant to Federal Rule of Civil Procedure Rule 38, Plaintiff hereby demands a trial by jury.

Dated:  White Plains, New York
December 16, 2022

Respectfully Submitted,

**FINKELSTEIN, BLANKINSHIP, FREI-PEARSON & GARBER, LLP**

By: */s/D. Gregory Blankinship*
D. Gregory Blankinship
John Sardesai-Grant
1 North Broadway, Suite 900
White Plains, New York 10601
Tel: (914) 298-3281
gblankinship@fbfglaw.com
jsardesaigrant@fbfglaw.com

*Attorneys for Plaintiff and the Proposed Class*